Good morning. May I please the Court, Laurie Schoenberg on behalf of the Petitioner Appellant. In this case, the Board of… Can you bring that mic a little closer to you? Oh, yes. I'm sorry, Your Honor. Your Honor, this case involves the Board of Immigration Appeals' abdication of its responsibility to review Ms. Suguja Mazzi's removal order and a determination of whether she's eligible for relief from that order. The Board has expressed the primary responsibility of reviewing appeals of removal orders in the first instance. In conducting that review, it cannot ignore evidence, distort or disregard aspects of a claim, or deny a case without reasoned explanation. If the Board does not consider an issue on appeal, this Court has nothing to review and must remand that case for an additional investigation or explanation. In this case, the Board rejected Ms. Suguja Mazzi's claims on appeal because she, quote, has not meaningfully challenged the immigration judge's decision or its underlying reasoning as it pertains to the timeliness of her application, the credibility of her claim, or the basis for her fear. The Board has not defined what they mean by a meaningful challenge to the removal order or to the denial of relief from that removal order. Its mandate that Ms. Suguja Mazzi make a meaningful challenge to the immigration judge's order to get the Board to review her case appears to have no basis in law. The Board's wholesale rejection of Ms. Suguja Mazzi's removal order and a determination of whether she's eligible for relief from that order is not in line with the Board's rationale and conclusion. Well, Your Honor, you cannot... Even if we accept where you're going with it, it gave that basis there, so why do we have to spend time with that if it did that, which would seem to fulfill this obligation to review the claims that said it did it? Well, Your Honor, I don't think that you can read those two sentences of the Board's decision in isolation. That sentence that you're referring to, in which they adopted and affirmed the immigration judge's asylum determinations, followed the statement that Ms. Suguja Mazzi had not meaningfully challenged the determinations with regard to her asylum claim. That second sentence contains no analysis of her claims, including the facts underlying the Board's determination, the legal standard the Board applied, or the reasoning of the Board when it adopted and affirmed the immigration judge's decision. In addition, Your Honor, since that preceding sentence said that Ms. Suguja Mazzi failed to quote-unquote meaningfully challenge the decision of the immigration judge on her asylum and withholding claims, this Court really doesn't have any idea what the Board reviewed. This Court does not know, for instance, whether the Board discounted certain aspects of her claim when it determined that there was no clear error in the immigration judge's decision on her asylum case, or whether it determined that she waived certain claims and therefore they didn't really look at it that closely. We don't know if the Board would have reached a different outcome if it had given all aspects of her claim due consideration. You know, we confront these cases all the time, but I'm just trying to understand that argument. If we deal with the meaningful challenge in the vacuum that you want us to, I don't know how we escape the fact that the Court, that the Board did go on to actually adopt those findings, and I don't think there's any requirement that the Board actually give you rationale. The Board still, yes, Your Honor, the Board still has to make a, has to give a reasoned explanation for its decision, and because of that preceding sentence that she failed to quote-unquote meaningfully challenge the immigration judge's decision... Do you think that might... Sure. I think it will pick up your voice better. Right here? Yes. I apologize, Your Honor. You know, because of that preceding sentence, we just don't know what the Board reviewed. All we have is a legal conclusion where they quote-unquote adopted and affirmed the immigration judge's decision. We don't know what aspects of the decision the Board adopted and affirmed. Why wouldn't we assume they looked at all of it, and all of it was the basis of their adopting the IJA's decision? Why would we not do that? The Board of Immigration Appeals does, I don't, we don't have enough information to make that determination, and given the preceding sentence where they said that Ms. Sugujimazi did not meaningfully challenge aspects of the immigration judge's asylum determination, I don't think that that assumption is warranted in this case. Why would they include that preceding sentence and then just adopt and affirm the immigration judge's decision in its entirety? That first sentence has to have some meaning, and that meaning, in my view, is that they discounted certain aspects of the claim because she didn't appropriately raise them on appeal. And that determination, in and of itself, was reversible error because, of course, the Board of Immigrant Appeals is not supposed to disregard aspects of the claim in determining whether it's going to adopt or affirm that decision. I'm sorry. I'm still having great difficulty hearing you. My apologies, Your Honor. You know, I would also note for the record that that second sentence where the Board said they found no clear error in the immigration judge's decision and where they adopted and affirmed the immigration judge's decision is a boilerplate statement. You know, basically, they're tracking the language of the regulations. Well, you don't contend that the Department isn't entitled to, as it did here, seek summary affirmance of the IJ's decision. Isn't that what happened here? Well, it doesn't appear that it was a summary affirmance. In circumstances in which somebody, for instance, fails to file an appropriate notice of appeal You're exactly right. It was a summary affirmance, but it included, quote, unquote, in any event. And the Board went ahead and fully adopted the IJ's findings and conclusions. I just don't think that we can make that. It was sort of a hybrid summary affirmance because they did more than simply say there was no meaningful challenge presented to us. They went ahead and conducted a review and embraced the IJ's decision, including her findings and conclusions. Well, Your Honor, I guess I would question why they would even need to say that she failed to make a quote, unquote, meaningful challenge. We can't read the Board's mind. All we can do is review what the Board did. And what the Board did here, it appears, is adopt the immigration judge's findings and conclusions, which therefore come before us as the decision of the Board and the IJ. Does it not? In other words, the regulation specifically allows the Board to do that, to adopt, without an opinion, the findings of the IJ. In that instance, then we go back to review what the IJ actually did. All that reasoning is there. Yes, the regulations allow the Board to do that, but then that doesn't explain why they had that preceding sentence in the decision, which, you know, suggests that in exercising that regulatory authority, that the Board may have discounted aspects of Ms. Zagujimazi's claims. Now, in addition to that, even assuming arguendo, that the Board has the authority to adopt and affirm the immigration judge's decision in its entirety, that calls into question what the immigration judge's decision was in this case. I'm looking right at the regulation here, 1003.1E4, that says the Board shall affirm the decision of the immigration judge without opinion if the Board determines the result on the review is correct, and that any errors that will be reviewed will be reviewed harmless or non-material. I mean, the regulation is pretty clear. Well, the regulations allow them to do that, Your Honor, but, you know, again, these sentences, I believe, have to be, you know, read in context. And, I mean, there is no reason for the Court to have included that preceding sentence if it just intended to affirm without opinion, as you're suggesting, or if it just intended to adopt and affirm the immigration judge's decision in its entirety. You know, each sentence of the Board's opinion should be given some significance, and in this case, the Board's preceding sentence in the same paragraphs tends to suggest that they, you know, disregarded certain aspects of the claim. Now, even assuming arguendo, that the Board did not do that, that still calls into question whether the immigration judge's asylum determination was something that should have been affirmed. And the immigration judge in this case determined that Ms. Suguzi-Mazi failed to present an objectively reasonable fear of returning to her country, Uganda, on account of her fear of forced circumcision based upon isolated statements in a UNICEF report that stated... Are you going now strictly to the... you're not going to argue the asylum, the timeliness issue, are you? Well, the timeliness decision, Your Honor, this Court likes jurisdiction over, you know, over a determination of the timeliness of the asylum application. Okay. I just wanted to make sure we were clear. Sure. But, you know, she applied for both asylum and withholding of removal, and the immigration judge did not consider those claims separately. They are, you know, they both derive from the same factual basis. So, I mean, the immigration judge in this case found that she did not have a, quote-unquote, an objectively reasonable fear of... And your burden is to persuade us that there's not substantial evidence supporting that finding and conclusion. Yes. And in examining whether there is substantial evidence for that conclusion, the Court has admonished immigration judges not to ignore legally significant evidence or evidence that contradicted those findings. Your Honor, I noticed that the yellow light is on. Unless this Court has any further questions, I'd like to resume... Since you have five more minutes. Okay, Your Honor. Thank you. Before your rebuttal. I apologize. That's all right. You know, so in this particular case, the immigration judge relied on an isolated statement from a UNICEF report that stated that 1% of all Ugandan women undergo female genital mutilation between the ages of 15 and 49. The immigration judge ignored voluminous evidence and testimony on the record that contradicted that assertion. Ms. Sugujimazi testified that her mother and her sister had undergone female genital mutilation, that she was from an area in northeastern Uganda that had a high incidence of female genital mutilation, and that she was from a tribe, the Sabini tribe, that practiced it. She had also testified about her sister's attempts to force her to undergo circumcision in her country. The UNICEF report that the immigration judge relied upon in that case even recognized that female circumcision continued despite efforts in the country to outlaw the practice. The State Department report, which this Court usually relies on for evidence of country conditions, recognized a relatively high incidence of female genital mutilation among members of the Sabini tribe, to which Ms. Sugujimazi belonged, and recognized 118 cases of circumcision within the reporting period. Other documentation in the record indicated that Sabini women experienced a much higher rate, as much as 50%, when the country as a whole might have a much lower incidence of FGM. The immigration judge ignored all of this evidence when she determined that, based on that UNICEF report, that Ms. Sugujimazi did not face a, quote-unquote, objectively reasonable risk of her subjection to forced circumcision in her country. Did he ignore it, or did he consider it, and then consider also that, to his conclusion, that it rendered her testimony incredible, or that it challenged the credibility of the witness? In terms of her testimony, on the one hand, she faces this fear of future prosecution. Yet she was her father, and he's in a tribe in which they do not practice female genital mutilation. I assume he's passed, so that's probably not available here now. But also testimony to the fact that she's older and professional women, even in that particular tribe, the Sabini tribe, don't typically go through that type of mutilation. And then the focus is on younger women. Typically this happens with young women who are, like, 15 years of age. Of course, she's much older now. So, I mean, there were some inherent inconsistencies between the documentation and her testimony, and that was what the IJ focused on. Well, Your Honor, Ms. Suguji-Mazi also testified that married women within the Sabini tribe underwent female genital mutilation for reasons other than marriage. In other words, to, you know, cure kind of a bad omen. And other documentation in the administrative record indicated that women among the Sabini, among members of the Sabini tribe experienced a much higher incidence of FGM. Ms. Suguji-Mazi had also testified as well that her sister sought to subject her to FGM, even though she was an older woman, because she, her sister, I think, had an issue with infertility. The immigration judge issued a credibility finding in which she stated that Ms. Suguji-Mazi testified credibly as to certain aspects of her quote-unquote general life, but then determined that the evidence on record, particularly this UNICEF report, contradicted that claim. That is reversible error, Your Honor, because the immigration judge cannot rely on a general statement in a country conditions report to rebut specific evidence about Ms. Suguji-Mazi's experiences in Uganda, particularly since the incidence of female genital mutilation among members of her tribe. And in northeastern Nigeria, it was much higher than the general population. With respect to her father, the immigration judge acknowledged that he was deceased, but there was no evidence in the record to support her finding that Ms. Suguji-Mazi could simply avoid mutilation  Thank you. May it please the Court, my name is Lance Jolly. I represent the respondent, the United States Attorney General. As substantial evidence supports the agency's relocation finding, Petitioner has failed to show that the record compels the conclusion that she has a well-founded fear of persecution. As the immigration judge found, FGM is no longer supported by the government. Petitioner can reasonably relocate. She was welcomed into her father's tribe, and she even took care of the children there, and there's nothing in the record to indicate that she could not return to that area. Her father's relatives live 300 miles away from the Sabini tribe, and there's evidence in the record that she can return and work. Before she came here, she worked at a university and was able to avoid the perceived threats of FGM. And they tracked her down, didn't they? They found where she was. They tracked her down. That doesn't, but there was no, yes. The daughter, the sister met. I only mention that because it rebuts your position that she was able to go to university. It doesn't mean that she was safe, because the record clearly shows that they tracked her down. As a matter of fact, that's the same sister and brother-in-law who were leading her into a ritual for the FGM to occur. And they told her we were coming back, and then she left, afraid, and reasonably so, that they would then throw her away. But to suggest that her sister would kidnap her and bring her to 300 miles away, that the Sabini tribe to force her to undergo FGM, it's not supported by the record. Sure, she tracked them down. But all we know in the record of that meeting between the sister and petitioner is that it was a short conversation. With their intent to come back. They said, we're going to come back. It shouldn't be a wait for them to come back. It could simply be the visit. It could just be, yes, the sister may blame the petitioner for all her problems. If that's, to go from there to the leap that she's going to be forced, petitioner, to undergo FGM. That's not a leap. She said that she was identified by somebody at the university as the woman who escaped FGM. Then her sister and brother-in-law came, and they had to visit, and they said, we're going to come back. That's the same sister and brother-in-law who were leading her to undergo female genital mutilation. I'm not just feeling that she might be pressured to undergo FGM. But being pressured into something is below being forced to do something. Under Chen versus INS, it supports that position as well. What about being in a taxi and someone says, wait a minute, you're the person that escaped. We know you're from your family. FGM, that's pretty fighting, isn't it? That she's identifiable and that her FGM history is known? Sure. Sure what? She's identifiable. It doesn't mean that anymore that she... Wouldn't it be frightening to you if you were in a restaurant and someone, the waiter's about to wait on you, and they said, yeah, you're the person that your family's looking for, aren't you? That'd be pretty unnerving, wouldn't it? I don't doubt the subjective genuineness of her fear. But the objective, whether it's well-founded, objective reasonableness of the fear, substantial evidence supports the agency's decision. But the agency's decision didn't look at the particular. For example, age normally might age her out. But here, the driving force for her to undergo this ritual was that they believed that this was causing the disease and illness in the family, serious back pain. And it's more than just whether or not marriage and age. They believed that there was, in a sense, an omen on the family because she escaped it. And that may not always be your belief system, but, you know, we're talking about a Sabini tribe and another country and a culture. And that's why the United States has decided that FGM is a torture or is persecution. While other countries and other people don't. But isn't that different? And I don't see any kind of analysis in that regard that is particularized to her. Her family felt that she was the cause of their illness. And if you ever had any back pain, I suppose you'd do a whole lot to make sure, if you believe that would stop you from having back pain, believe it. And I know it's difficult for people who are from different belief systems, but you don't have to put yourself in that frame of reference. And I don't see that was done at all in this record. A couple points. I know I ask you a lot of questions at the same time. Go ahead. A lot of the immigration judge's finding was based on lack of evidence. There's nothing in the record that indicates that the Sabini goes outside the tribe to kidnap and forcibly sterilize people. The record suggests that if she went to the Sabini tribe for like a wedding or a funeral, that maybe there the elders would take advantage of that opportunity. There's nothing in this record that suggests that they go outside the northeast area to do that. So as long as she does not return to the Sabini tribe, there's nothing in the record to indicate that she would be forcibly sterilized or forcibly circumcised. In Gomez, at least there was a letter from the father to corroborate the fear that he was going to subject his daughter to FGM. Here there's nothing. None of her friends who have told her that she would be subjected to FGM submitted letters in the record. This is solely her testimony, and the immigration judge was not persuaded by that testimony. And the record simply does not compel a contrary conclusion. But it seems like in this case, when she was in the United States, she went back because her father was still living, right? Yeah. But if she was someone who was sort of dishonest or didn't have a reasonable objective fear, or somebody who just wanted to stay in the United States, she went back because she thought her father was the difference. But now he's dead. Doesn't that help in terms of corroborate her objectives of fear, her good faith? Because it wasn't like she's making this up. Well, there's two edges to that return thing. One could reasonably say it was because her father, but the second is, why does she go back at all? Because that's her country. Because her father's not going to live forever. That's her country. Right. I understand that. Aren't you a patriotic American? I am. Well, actually, she'd be less about her country. It's only because she's threatened with torture. All I'm saying is that her return. You're being almost cavalier. You can't relate to someone else wanting to go back to their country. But the immigration judge didn't rely on the fact that she returned as a basis for why she didn't have a well-founded fear. I don't know what it relied on. It gave her a little good shrift type in it at all, really. And the BIA, and I agree, we can deal with it on the record. The BIA just wasn't even meaningful to them, and then it's primarily done. If you look at her, if you look at the appellate brief, the appellate brief only challenged past persecution claim and ineffective assistance of counsel claim. And the board, in the beginning of this decision, dispatched an effective assistance of counsel claim saying she didn't substantially comply with LASADA, and she didn't meaningfully challenge these other aspects. If you read just the appellate brief, I can see where the board is saying she didn't meaningfully challenge. But the board, as the scores noted, also said, in any event, we adopt and affirm. So this court can look to the immigration judge's decision. And as the record does not compel the conclusion that she cannot reasonably relocate in Uganda, the court should deny the petition for review. The record, the country conditions report repeatedly give the sense that educated women who can support themselves professionally can avoid FGM. But this record indicates, at least in this record, that she was not able to do so. You can't just take the general statistics when you have, here she said at the university, in her professional role, all those advantages she had, she still was subject to their pressure and threats. And other people were saying, yeah, she is particularly notorious. Pressure I would grasp. More than pressure. She was not threatening her. You going to let me talk? Sorry. That's more than just that sense of it. What she's saying, they hunted her down. In this country, the United States, we say that that's persecution to undergo FGM. But when you're talking about particularized threats, not just threats but you show up, you must admit that's pretty unnerving that even a taxi driver, who you would think you'd be totally innocuous, so much she's so particularized in the threat to her that he even knew. Yeah, you're the woman who escaped FGM. And your family is looking for her because you're bringing a curse, if you will, on your family. And until you get that procedure done, they will be suffering. That's particularized. It's not just statistics. Ordinarily, maybe so. But this case is different. And I want to address how did they deal with the difference. All they did was, oh, well, the government is, that's not legal now in general statistics. So she could move to some unknown place. But we're talking about addressing the specifics of the threat to her. And in this case, how was that addressed? How was that addressed? Other than the statistics. Well, she's aged out. She could go someplace else that's normally not. But how did they address those threats? She was able to avoid. She moved. She was recognized three times over five years. And each time she moved. She felt pressured, so she moved. She felt welcome in her tribe, in her father's tribe. And the immigration judge, had she presented more evidence to back up her testimony, it could have easily been a different result. And even that with her tribe, it's her father that was her protector. She was the child of the youngest wife. And the youngest wife in the order is the lowest in terms of authority. Family, the connector for her was her father. The other children were the three previous wives. I mean, you have to take some interest in getting through the layers of what the case is about. It's not just willy-nilly, okay, well now you'll, but her mother left with her siblings. It was her reconnection with her father that gave her the protection. And now he's dead. That's meaningful. It's not like we think of like going down to the state, well, you know, your uncle's there. It's different. Your Honor, you're correct. But the issue is she has the burden of proof to establish that she has a well-founded fear of persecution. The only evidence in the record is her testimony of perceived threats and of  There's just nothing in the record. And as such, the record cannot compel the conclusion that she has. Are you saying that her credible testimony alone as a matter of law cannot be sufficient? Under the facts of this case, that's correct. Under the facts of this case. It may be. The general principle, you are correct, that a credible testimony alone may be sufficient. Right. At the same time, the applicants need to meet a burden of proof and submit corroborating documents. She had friends who supposedly called her. They could have submitted a letter to corroborate the fact that she was tracked down. And that would have bolstered her case. Is there a finding that she wasn't credible on that question? It was. The immigration judge seems to conflate credibility and the objective reasoning. It wasn't answered my question. Was there a finding that she wasn't credible on that event? No, it wasn't. The immigration judge found that her claim was not inherently plausible. I don't think the immigration judge found that it was not a subjective genuine. The immigration judge didn't go through the norm, the regular order of that she established subjective fear. And after determining that piece, prove a well-founded fear. The immigration judge kind of conflated the two. In this case, you have to go back at the very least to be remanded so we have a clear assessment of the facts in this case. The relocation finding would mean that the court need not remand it to reconsider the objective well-founded fear aspects of the concerns that you have raised. Is she permanently precluded from an adjustment of status at this stage? Based on her fraud in her first marriage, it would appear so. Is there a 10-year? I would have to follow up on that. And if there is, I could. No, I'm not asking you to do any research. She's permanently barred from any kind of based on marriage or family connection. That's permanent. Correct. That's correct. If the court has nothing else, it should deny the petition for review. Ms. Schellenberg. Your Honor, just a couple of points in response to what Government Counsel raised. First of all, Government Counsel argued that country conditions have changed in the country of Uganda. Ms. Schellenberg, you're going to have to be pleased if you would speak up because it's hard to hear you and to hear your client's claim in this case. I am so sorry, Your Honor. Just a couple of points in response to what the Government raised. First of all, the Government has argued that a ban on the practice of female immigration judges' determination, that Ms. Sugujimazi did not face an objectively reasonable fear of forced circumcision in her country. And looking at that change, this Court has to review not just the fact that the law changed, but the community's reaction to that change. As I have argued previously, the immigration judge cannot rely on general statements in a country condition report to rebut the applicant's specific experiences in her country of origin. With respect to that 2010 ban on forced circumcision, certain communities, including the Sabini tribe, have reacted to that ban by increasing the practice of forced circumcision and, in fact, taking women to places like Kenya to get circumcised. So the reliance on that particular change in country conditions has to be considered in light of that contradictory evidence, which the immigration judge ignored in this case, but which was in the record. To the point to even go across borders to enforce it. Exactly, Your Honor. With respect to the issue of relocation, Government counsel has argued that she could simply relocate to another area of the country to avoid persecution. The immigration judge ignored much of the contradictory evidence in this case, but one thing that the immigration judge ignored in particular was an assertion in Ms. Sugujimazi's declaration that her sister took her to a coffee plantation in the dead of night and attempted to induce her to undergo forced circumcision. In response to that threat, Ms. Sugujimazi fled the area and, in fact, left on a bus to go 300 miles away. And that's the same sister and brother-in-law that showed up at the university. The same sister and brother-in-law that showed up at the university, the same sister and brother-in-law that seek to have her undergo circumcision to cure their diseases. You mentioned back pain. There was also some indication in the record that her sister was experiencing infertility and that, under tribal customs, the Sabini tribe believes that circumcision is something that can cure impurities and that can cure incidences of bad luck. Ms. Sugujimazi also attested as well to the forcible circumcision of one of her university classmates when that classmate returned from Kampala to her village. That suggests that even though the incidence of FGM in the country may be low, the incidence of FGM in her community and among the Sabini tribe may be higher and that family members may seek to force the women in their family to undergo Government counsel also indicated that there was nothing that shows that the Sabini tribe dragged somebody from outside their community to be forcibly circumcised. We don't have to reach that conclusion here because Ms. Sugujimazi's undisputed testimony indicates that she was from the Sabini tribe. She testified that her mother and her sister considered her to be members of the Sabini tribe, and, in fact, they were pursuing forcible circumcision even though she moved to an area of the country where she was not living with the Sabini tribe. What was the timeliness argument that you brought before the board? The timeliness argument that was brought before the board was twofold. One, that her maintenance for a period of time of non-immigrant status justified an exception to the one-year filing deadline, but also there were changed circumstances here. In particular, the death of her father in 2010 meant that she lacked protection in her country from forced circumcision. Did you generalize the timeliness in terms of the application, asylum application? Yes, Your Honor. That was in the appeal brief and that was in the notice of appeal. The previous counsel actually in this case argued that the immigration judge erred by finding that there was no exception to the one-year filing deadline under Section 208A2D of the Immigration and Nationality Act. In the appeal brief, previous counsel did argue that a maintenance of non-immigrant status and pending applications for immigration relief justified an exception to the filing deadline. In addition, the appellate brief specifically challenged the finding by the immigration judge that the one-year deadline was not met in this case, and the immigration judge's decision, the immigration judge determined that her father's death in 2010 and this change in the law regarding FGM and the community's reaction to it did not justify exceptions to the one-year bar. That, you know, the Board of Immigration Appeals did not review, even if this court cannot review it. This court still has to ensure that the adjudicator does not ignore that evidence or fail to reach that issue. With respect to questions concerning the absence of corroborative evidence in this case, Mr. Jolly indicated that the immigration judge was justified in denying relief based upon Ms. Segujimazi's failure to corroborate her claims that she would be forcibly circumcised in her country. I'm not entirely aware of Fourth Circuit precedent on this issue, but I would note for the record that other circuit courts, particularly the Ninth Circuit and Wren v. Holder, have said that when an immigration judge relies on the absence of corroborative evidence to deny a claim, they must provide advance notice of the need for corroborative evidence and an opportunity for the respondent to get that evidence before they issue that decision. The immigration judge did not do that in this case, and she ignored, you know, numerous aspects of the evidence, documentary and otherwise, that corroborated Ms. Segujimazi's claim that she, in fact, would be forcibly circumcised. That is in addition to the fact that the immigration judge selectively reviewed certain aspects of her claim, reversible error, which requires a vacater of the Board of Immigration Appeals decision in this case. Thank you. Thank you, counsel. We'll come down to you, counsel, and then have a brief recess.
judges: Roger L. Gregory, James A. Wynn Jr., Andre M. Davis